IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WINGLET TECHNOLOGY, LLC.,
    Plaintiff,

vs.                                        No. 18-1117-JTM

FORT FELKER,
    Defendant, Counterclaim-Plaintiffs, and
    Third-Party Plaintiff,

vs.

ROBERT L. KISER,
    Third-Party Defendant.

MEMORANDUM AND ORDER

This is an action arising from prior contractual relations (and litigation) between plaintiff Winglet Technology and Dr. Fort Felker, and touches on a patent for elliptical airplane winglets. The matter is before the court on the motion of defendant Felker to enforce the terms of an alleged settlement agreement between himself and the plaintiff Winglet.

The parties engaged in settlement discussions throughout the first part of 2019. The present dispute arises from the communications between the attorneys for Winglet and Felker during July. At 2:00 pm on July 9, 2019, Felker wrote to Winglet:

> Since our conversation this morning, I have had an opportunity to discuss this matter with Fort Felker. As we discussed, he is very concerned about receiving the second payment in light of the history

between these parties. Fort does not agree to dismiss the case with prejudice until Winglet makes payment of $245,000. Fort will, however, agree to Winglet's proposal to accept $245,000 in two payments (one made upon execution of the agreement and a second made before the end of the year) with the following conditions. The parties would enter into a settlement agreement wherein upon execution, the case would be dismissed without prejudice, Winglet would make payment to Felker in the amount of $122,500, and Felker would assign the patent to Winglet. Then, once the second payment is made, Felker will assign his outstanding interest in Winglet, the full mutual releases would take effect and the parties would be prohibited from refilling the claims asserted in this litigation (or any other claims). There would be language in the agreement that, if payment is not made, then Winglet "hereby assigns the patent back to Felker." In the event a party breaches the settlement agreement, the prevailing party would get attorney fees.

A half hour later, Winglet responded:

    Thanks for your proposed counter, which is again respectfully rejected unless amended as follows.

    We are in agreement on all terms except that the case must be dismissed with prejudice. Otherwise, investors, business partners, and the business community writ large will infer that the case could be refiled and the longstanding feud between our clients renewed.

    If for any reason Bob fails to pay the second payment, you would get your patent back, could sue to enforce the settlement agreement, and Bob would have to pay your fees for doing so.

    If Fort wants to avoid the minimal risks associated with this offer, he can accept our single payment offer of $210k.

    Failing one of these two options, we are prepared to continue with the litigation.

A few hours later, counsel for Felker accepted the offer:

    Fort accepts the $245,000 offer as set forth in your email below, subject to the execution of a mutually-agreeable settlement agreement with full mutual releases. So to recap, Winglet agrees to pay Fort $122,500 upon execution of settlement agreement, and another $122,500 by Dec 31, 2019. Felker will assign the patent upon execution of the agreement, but

Winglet will agree that if payment is not made by December 31, 2019, then it "hereby assigns the patent" back to Fort. The parties will file a dismissal with prejudice upon the execution of the Settlement Agreement. In the event a party breaches the settlement agreement, the prevailing party would be entitled to recover its attorneys' fees. Hence, if Winglet fails to pay the $122,500 by the end of the year, Winglet will agree to pay Felker any attorneys' fees incurred in pursuing a collection action against Winglet. Felker will transfer his interest in Winglet upon receipt of the second payment.

I appreciate you taking the first crack at a settlement agreement. As I mentioned, I will be out of pocket on Thursday and Friday. Therefore, hopefully we can either get this done tomorrow, or get relief from our deadline to mediate so we don't all have to meet up in Kansas next week.

Winglet's counsel responded: "Thanks, Michael. I'll get you a proposed settlement doc in short order."

The following day, July 10, Winglet sent Felker a draft Joint Motion to Extend Deadline to Mediate, which included the observation: "Good cause exists to amend the Scheduling Order as the parties have reached a settlement agreement but have not yet prepared or executed a final settlement agreement." Winglet filed the Joint Motion then next day, July 11, informing the court that "the parties have just reached a settlement."

On Friday, July 26, 2019, Winglet forwarded a Confidential Settlement and Release Agreement, which included some of the terms from the July 9 exchange, but included provisions which had not been mentioned then. In particular, the July 26 draft omits the provision for assigning the patent back to Felker if Winglet fails to make the second payment, while adding a five-year, nationwide covenant not to compete and trade secret protection provisions.

On the following Monday, July 29, 2019, Felker provided some comments on the draft, adding the assignment-back and deleting the restrictions of Felker's ability to compete.

On Wednesday, July 31, Winglet again removed the assignment-back and added the restrictions, stating: "We have accepted as many of [Felker's] propose changes as we could, but there were some requests my client could not accommodate. I have counter-edited and added explanation where necessary." Winglet also wrote that it "will pay Felker the previously offered $210,000 in one payment if Felker would rather avoid the risk of split payments."

Later the same day, Felker responded with a modified version of the agreement, stating:

> We have reviewed the latest version of the Settlement Agreement and Release you forwarded this afternoon. We accepted many of your proposed changes and made further changes to conform it to the agreement of the parties. These changes address issues including the following: (1) the agreement does not include a provision that Winglet will agree that if the second payment is not made by December 31, 2019, then it hereby assigns the patent back to Fort, (2) it includes covenant not to compete and trade secret provisions that were never discussed and never agreed to by the parties, (3) it provides that Winglet will have no further obligations to Felker relating to his ownership or membership interests in Winglet prior to the time that Felker transfers his interest, and (4) it provides a three-day grace period for the first payment (rather than effectuating a wire after signing the agreement). I have also included a clean Settlement Assignment. We accepted all of Winglet's changes to that document.
>
> As you know, we have a looming deadline to report back to the Court. Therefore, we request that you confirm by 2:00 your time tomorrow that Winglet is willing to execute this written settlement agreement with the foregoing substantive changes.

Winglet did not agree that an agreement existed, but indicated a willingness to discuss the issues. Felker responded:

> I am happy to have a call tomorrow. 9:30 MT works for me.
>
> Please understand that Fort Felker is not willing to renegotiate this deal. As you know, we reached a settlement agreement on July 9, 2019, which was a product of extensive negotiations. You graciously agreed to draft a Settlement Agreement to memorialize that settlement agreement. Winglet's counsel then filed a Joint Motion to Extend Deadline to Mediate stating that "the parties have just reached a settlement…." On July 26, 2019, you sent a draft of the settlement agreement with certain material terms omitted, and certain material terms added. Therefore, the draft agreement did not conform to the agreement we reached. After informing you of this fact, your client appears to persist in attempting to renegotiate this deal and has provided every indication that it will not abide by the terms of the settlement agreement. As you know, an agreement to articulate the settlement in writing is not an invitation to renegotiate the deal; indeed, Felker is not willing to renegotiate the settlement at this time – especially after our weeks of negotiation leading up to the July [9], 2019 agreement. Therefore, we intend to file a Motion to Enforce the July 9, 2019 settlement agreement by the end of the day tomorrow. In doing so, we will ask the court to award our fees in making that effort. We can confer further about that motion in the morning, unless your client is willing to sign the agreement as proposed. Indeed, we appear to be in agreement on all of the other provisions of the written document.
>
> I appreciate your efforts to help get this done and look forward to talking with you tomorrow.

On August 2, 2019, Winglet's counsel stated the following:

> Thank you for your message yesterday. I've considered your comments and conferred again with my client, and will offer a final proposed version of the settlement within an hour or two that will hopefully suit our respective needs. I do not need the call I requested yesterday.

Later that day, Winglet sent a settlement proposal which did not include the assignment-back provision, and retained the provisions relating to trade secrets and the covenant-not-to-compete. Winglet's counsel wrote:

> Attached is our final settlement offer. If Dr. Felker does not accept this proposal (or something very close to it) by the end of the day, then you may consider the offer withdrawn and we can continue our litigation.
>
> I again accepted everything I could in your proposal, though we still have some ground to cover. Here's where we stand …
>
> ….
>
> If this version of the Agreement is not acceptable, we have taken the liberty of contacting Jerry Palmer's office again for mediation dates. He is currently available to mediate in Topeka, KS on August 20, 22 and 23 and the week of the 26th thru the 30th. We would need to let the court know by Monday of our status.

In the present motion, Felker argues that an agreement to settle the action arose on July 9, that the terms are definite and not the subject of substantial dispute, but that following the agreement Winglet sought to materially modify the terms, by removing one key provision (the reassignment of the patent) which had been explicitly bargained for, and adding another (restrictions on the ability to compete and reference to trade secrets) which are onerous, are otherwise disfavored by Kansas law, and which were not addressed in the negotiations. Felker asks that the court require Winglet by specific performance to execute and abide by the final version of the Settlement Agreement exchanged between the parties that reflects the essence of the July 9 agreement.

In response, Winglet offers a number of rationales why no agreement arose on July 9, none of which is persuasive. For example, the plaintiff points to the statement by

Felker's counsel, at the conclusion of his July 31 email, indicating that he hopes Winglet will then "confirm that it is willing to execute this written settlement with the foregoing substantive changes." This, plaintiff contends, shows that the parties did not believe that there was then any agreement, and that the parties were divided by fundamental disagreement on substantive issues. (Dkt. 48, at 4, 11-12).

In context, however, this statement is not at all inconsistent with the conclusion that the parties had earlier reached a binding agreement. The "changes" mentioned in the email are changes to the new draft sent earlier that same day by Winglet, and earlier in Felker's responsive email, counsel expressly states that the "changes" to the proposed final settlement document were made "to conform it to the agreement of the parties" — that is, to the July 9 exchange of terms.

The main argument of Winglet, however, focuses on the qualification included in the final, 9:51 PM email by Felker on July 9, where counsel wrote that he accepted the terms sent by Winglet at 2:30 PM, "subject to the execution of a mutually-agreeable settlement agreement with full mutual releases." This, Winglet argues, shows that the parties had merely entered into an agreement to agree, and had not achieved a meeting of minds on the material issues in the case. (Dkt. 48, at 6). These issues included the covenant not to compete, which Winglet notes, existed in a prior Officers Agreement and Consulting Agreement entered into between the parties.

Again, the July 31 request that Winglet confirm it was willing to agree to proposed "changes" simply reflects a desire by Felker that Winglet abandon its efforts to modify the already existing contract on substantial issues — that is, the changes were

7

to remove Winglet's changes, and thus to create a final settlement document which would "conform" to the earlier agreement. The "subject to" language added to the 9:51 PM email simply indicates the final settlement documents would require some back and forth as to precise wording, but there is nothing in the email to suggest that any substantive issues remain.

The email exchange on July 9 addresses all the issues necessary for a settlement, including the amount of money to be exchanged, the timing of payment, the effect of non-payment and the nature of the releases. The first email, at 2:00 PM, sets forth in detail the proposed settlement as to how the case would be settled, including the provision for two payments, under which the case "would be dismissed without prejudice" on the first payment, and if no second payment was made, the disputed patent would be assigned back to Felker.

Winglet wrote in response at 2:30 PM that this offer was rejected "unless amended as follows," and then proceeded to list one and only one proposed amendment: that on the initial payment, "the case must be dismissed with prejudice." The email explained that this change was necessary to prevent undermining investor confidence.

The 2:30 PM email also suggests that, instead of two installment payments totaling $245,000, the case might be settled for a one-time, $210,000 payment. "Failing one of these two options, we are prepared to continue with the case." There is no suggestion in the email that any restrictions on competition or trade secrets was an essential element of any settlement. To the contrary, the only issue raised by the email is

8

the need to dismiss the case with prejudice, and the email thus directly suggests that, if Felker agreed to one of the "two options" for how the payment was structured, Winglet was willing to no longer "continue with the litigation."

Most importantly, the email acknowledges Felker's earlier email and expressly states that, other than the need to dismiss the case with prejudice, "[w]e are in agreement on all terms." The email expressly goes along with the sticking point set forth in the earlier email — the concept of a reassignment of the patent in the event of a default: "If for any reason Bob fails to pay the second payment, you would get your patent back." The email further agreed that in the event Felker had to sue to enforce the settlement agreement, he would also be entitled to attorney fees.

Here, coming at the end of a long course of settlement negotiations between the parties, and during the course of communications explicitly using the terms of offer, counteroffer, and acceptance, the statement that the parties are in "in agreement on all terms" should be taken to mean precisely that. The parties agreed to "all terms" essential to deciding whether "to continue with the litigation."

Felker then expressly accepted the offer, summing up the terms of the agreement in a manner wholly consistent with the earlier communications. At no time does any party suggest that additional restrictions on the use of trade secrets or competition is essential to the agreement, and, as noted, Winglet expressly did not oppose the concept of assignment-back of the patent.

The parties not only manifested the existence of an agreement between themselves, they represented that an agreement existed to this court. Shortly after the

9

July 9 exchange, Winglet drafted an order to defer the upcoming mediation, observing in the order that "the parties have reached a settlement agreement but have not yet prepared or executed a final settlement agreement," and stating in its motion that "the parties have just reached a settlement." Winglet's representations are wholly unqualified – it does not ask to defer mediation because the parties have "almost reached" a settlement, or that they have reached "potential settlement."

The law favors agreements to settle disputes. *See Lowery v. County of Riley*, 738 F.Supp.2d 1159, 1168 (D. Kan. 2010) (citing *Advantage Properties, Inc. v. Commerce Bank*, 242 F.3d 387, 2000 WL 1694071 at *2 (10th Cir. 2000)). Under Kansas law, "a contracting party is bound by an agreement to which he assents, where the assent is uninfluenced by fraud, violence, undue influence, or the like, and he will not be permitted to say he did not intend to agree to its terms." *Sutherland v. Sutherland*, 187 Kan. 599, 610 (1961) (citing *Maltby v. Sumner*, 169 Kan. 417 (1950)). Kansas law supports the enforcement of settlement agreements where the parties manifest agreement to be bound as to the material terms of their bargain. *Unified Sch. Dist. No. 446 v. Sandoval*, 295 Kan. 278, 286 P.3d 542 (2012).

Felker relies on *Lowery*, 738 F.Supp.2d at 1168, and *Hill v. Hutchinson Care Center*, 2015 WL 59277073 (Kan.Ct.App. Oct. 9, 2015) where the court concluded that a handwritten settlement was enforceable, even when the intended final settlement agreement was never executed, where the writings between the parties addressed all of the ordinary material terms in a settlement agreement and the parties subsequent

"outward expressions of assent" showed "that the parties consummated a binding and enforceable settlement agreement." 2015 WL 5927073, at *8.

There is substantial case law support for Felker's position. These authorities distinguish two types of cases:

> It is common for parties to sign informal documents with the understanding that a more formal contract will follow. Courts have recognized two types of preliminary settlement agreements. First, there are preliminary agreements where parties agree on certain major terms but contemplate further negotiations over other terms. These preliminary contracts are binding only in the sense that the parties accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement. Second, there are preliminary agreements where parties agree on all major terms of the contract and intend to be bound, but they wish to memorialize their agreement in a more formal document. **This type of preliminary agreement is fully binding on both parties despite the anticipation of further formalities, even if the parties do not execute a more formal contrac**t. In some cases, an informal stipulation of settlement may be such a fully binding agreement. The mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.

*JMC Rest. Holdings, LLC v. Pevida*, No. 14-6157, 2017 WL 6418939, at *4 (E.D.N.Y. Sept. 28, 2017), report and recommendation adopted, 2017 WL 6417281 (E.D.N.Y. Oct. 6, 2017) (emphasis added, citations and interal quotations omitted). In this case, the court held that a binding agreement arose when the communications suggested that the parties had resolved the essential issues in dispute, even though the same communications referenced to a "tentative" settlement which was "expressly subject to a further Long-form Settlement Agreement to be executed by the parties." *Id.* Other cases have also determined that such "subject to" language is not fatal to the creation of an enforceable settlement, if the parties otherwise manifest an agreement to be bound. *See HSBC*

11

*Mortgage Services, v. Daya*, No. 16-cv-80, 2016 WL 7156551, *10 (E.D. Wis. Dec. 7, 2016) (enforcing agreement "subject to the execution of releases"); *North Fork Country, v. Baker Publications*, 436 F.Supp.2d 441, 442, 448 (E.D.N.Y. 2006) (enforcing "agreement in principle subject to the execution of more formal documents."); *Pisarz v. PPL Corporation*, No. 10--01432, 2014 WL 220778, *1, 5 (M.D. Pa. Jan. 21, 2014) ("subject to the execution of a Settlement Agreement"); *Kelly v. Hunton & Williams*, No. 97-5631, 1999 WL 759972, *1 (E.D.N.Y. Sept. 21, 1999) ("Subject to Kelly's execution of an appropriate settlement agreement and release").

Winglet argues that the communications between the parties were inconclusive and unenforceable. *See New York Life Ins. v. KN Energy*, 80 F.3d 405, 409 (10th Cir. 1995) (no contract exists "[w]hen the language of an agreement demonstrates that the document is merely an agreement to agree"). Winglet relies on *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 815 (7th Cir. 1987), which concluded that no enforceable settlement occurred.

The cases cited by Winglet are distinguishable. In *KN Energy*, the parties had merely reached an "agreement in principle" which did not address all the particular issues in the case. 880 F.3d at 411. In *Skycom*, the court determined that no contract existed because the parties had only addressed some issues while leaving others open. The court expressly observed that "[t]he parties are the masters of their affairs," and can indeed "elect to bound by writings that call for subsequent memorials." 813 F.2d at 814.

Here, as noted earlier, the parties were in agreement on "all terms" relevant to whether the lawsuit would continue. Winglet promptly sought relief from the court's

scheduling order on the grounds that the case had been settled. Enforcement of the settlement agreement is appropriate.

As a final argument against settlement, Winglet argues that Felker should be estopped from enforcement of the July 9 agreement, by his subsequent actions in the back-and-forth discussions during the next few weeks, during which the covenant not to compete and the patent reassignment provisions were alternatively added and removed from the final settlement language. The court has previously indicated its conclusion that this back-and-forth fails to contradict the conclusion that an enforceable settlement already existed on July 9. A similar conclusion is appropriate with respect to plaintiff's estoppel argument. None of the subsequent communications by Felker indicate that he did not believe a binding contract existed. Indeed, Felker indicated that he wanted the additional language dropped since this was necessary to "conform" the final document to the earlier agreement. With further respect to the estoppel argument, Winglet has failed to show how in any way it changed its position or relied to its detriment on any representations by Felker during the back-and-forth discussions.

Defendant seeks attorney fees relating to its Motion to Enforce, citing the statement in the 2:30 PM email relating to the payment of fees. (Dkt. 43, at 13; Dkt. 43-1, at 3; (Dkt. 52, at 8-9).[1] Winglet not only opposes any request for the payment of fees to

---

[1] Defendant does *not* cite the final Settlement Agreement itself, which provides in Section 12 that "if any Party brings an action at law or in equity to enforce or interpret the provisions of this Agreement, the losing Party shall pay the prevailing Parties' attorneys' fees, costs and disbursements for enforcing this Agreement." This provision cannot support an award of fees to Felker here because the provision appears to be triggered by a separate "action at law or in

13

Felker, but argues that Felker should pays its fees, because he violated the terms of the confidentiality clause (Section 13.3) of the agreement by filing the present motion.

The court hereby denies both requests. Although Section 13.3 of provides that a party may not disclose "the existence or terms of this Agreement," the same provision also expressly provides several exceptions to this requirement, including (unsurprisingly) the right to "(iv) disclose this Agreement as necessary to enforce the terms of this Agreement." Under the circumstances, plaintiff Winglet is not entitled to any award of attorney fees under the Agreement.

Nor is defendant Felker. The passage from the 2:30 PM email that Felker cites actually provides:

> *If for any reason Bob fails to pay the second payment*, you would get your patent back, could sue to enforce the settlement agreement, and Bob would have to pay your fees for doing so.

---

equity" to enforce the Agreement. Here, plaintiff is seeking a determination, in the original litigation, that an agreement to settle existed. Absent a clear and definite agreement to require the payment of fees under these circumstances, no right to fees exists.

This conclusion is further supported by the limited commitment to fees identified above in the 2:30 PM email, as identified above. But it is also supported by Felker's 9:51 PM acceptance, which stated:

> *In the event a party breaches the settlement agreement,* the prevailing party would be entitled to recover its attorneys' fees. Hence, if Winglet fails to pay the $122,500 by the end of the year, *Winglet will agree to pay Felker any attorneys' fees incurred in pursuing a collection action against Winglet*.

(Emphasis added). Because the court addresses the fundamental question of whether any agreement exists at all, and is not presented with a separate collection action arising from a breach for nonpayment, no obligation for the payment of fees exists.

(Emphasis added). The right to recover fees is expressly conditional; it arises where Winglet makes a first payment but fails to follow through on the second.

Finally, Winglet argues that Felker violated "his obligations to Winglet and Kiser and this Court." (Dkt. 48, at 15). Winglet does not specifically identify the source of these obligations, other than its earlier email to Felker, after the Motion to Enforce was filed, that "you owed us a duty to confer prior to filing this motion." Finally, defendant argues "[f]urther," (Dkt. 48, at 16) that Felker violated Fed.R.Civ.Pr. 11 when he stated (Dkt. 42 at 2) that "The parties have conferred in writing and by conversation, but have been unable to resolve this dispute prior to the filing of this Motion."

The court finds that these allegations are insufficient to deny the Motion to Enforce. Presumably, the duty to confer referenced by Winglet is D.Kan. 37.2, which expressly provides that the duty to confer is required before the court will "entertain any motion to resolve a discovery dispute." This is not a discovery dispute, and the rule is inapplicable.

Even if such duty were applicable, the court finds no violation of that obligation (or of Rule 11). As set forth above, counsel for both parties engaged in an extended back-and-forth about the terms of the settlement, Felker indicated its position that it believed an enforceable agreement had arisen on July 9, and that it intended to file a motion to enforce unless Winglet agreed. Once the parties' positions, and the need for court intervention, are clear, the obligation to confer does not require further delay *ad nauseum.*

The court has the power to summarily enforce a settlement agreement between the parties to a case which is still pending in that court. *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir.1993); *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004). The court does so here, and directs and requires the parties to execute and give effect to the last draft Settlement Agreement (Exhibit J to Felker's Motion) fully and completely as of the date of this Order.

IT IS SO ORDERED this day of January, 2020, that the defendant's Motion to Enforce is hereby granted as to its request for specific performance and execution (Dkt. 42, at 2 ¶ 2); the court denies the request for attorneys fees and costs (*id*. ¶ 3).

s/J. Thomas Marten<br>J. Thomas Marten, Judge